[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15588
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cr-20275-KMM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE L. VALDES GONZALEZ,
a.k.a. Roberto Gonzalez,

Defendant-Appellant.


_____

No. 12-15590
Non-Argument Calendar
_____

D.C. Docket No.  1:12-cr-20275-KMM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALBERTO SOTOLONGO,
a.k.a. Ruben,

Defendant-Appellant.

_____

No. 12-15591
Non-Argument Calendar
_____

D.C. Docket No.  1:12-cr-20275-KMM-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANCISCA GEMA VALDES,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(February 7, 2014)

2

Before CARNES, Chief Judge, PRYOR and MARTIN, Circuit Judges.

PER CURIAM:

Jose Valdes Gonzalez, Alberto Sotolongo, and Francisca Gema Valdes each pleaded guilty to one count of conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349.  In their plea agreements, the government agreed to pursue sentences at the low end of each defendant's advisory range under the United States Sentencing Guidelines.  The sentencing court, however, did not agree that low-end sentences were warranted.  It sentenced Gonzalez and Sotolongo to 84 and 72 months imprisonment respectively.  Those sentences were above the advisory ranges calculated under the guidelines.  Valdes received a 46-month sentence, which fell at the top of her guidelines range.  Dissatisfied with that outcome, the defendants now appeal their sentences on several grounds.

## I.

The defendants conspired to commit healthcare fraud while working at Ilva Pharmacy in Hialeah, Florida.  As part of their conspiracy, Gonzalez had a standing agreement to provide cash payments to a physician in exchange for fraudulent prescriptions.  The physician would give Gonzalez prescriptions for patients the physician had not treated, and Gonzalez would pay him approximately $250 for each patient for whom he wrote fraudulent prescriptions.  Gonzalez would

then seek reimbursement from Medicare for the prescribed medications, even though he never dispensed them.

Sotolongo and Valdes worked with Gonzalez to carry out the conspiracy. Sotolongo falsified patient forms while Valdes provided information to the physician so he could write the false prescriptions. According to the stipulated facts in the plea agreements, the defendants and Ilva Pharmacy fraudulently billed Medicare for approximately $1,352,936 in benefits from 2007 to 2011.

When the probation office calculated the defendants' advisory sentences under the sentencing guidelines, it included several enhancements to their base offense levels. Those adjustments included a 16-level enhancement under U.S.S.G. § 2B1.1(b)(1)(I) because the loss amount fell between $1 million and $2.5 million and a 2-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C) because their offense involved sophisticated means. When each defendant's criminal history was taken into account, the sentencing guidelines provided the following advisory sentence ranges: 37–46 months for Valdes, and 46–57 months for Gonzalez and Sotolongo.

At sentencing, the defendants challenged the guidelines calculations and sought sentences below their advisory ranges. They first objected to the sophisticated means enhancement. They contended that there was nothing sophisticated about their conspiracy; it was just run-of-the-mill fraud. Gonzalez

and Valdes also sought both downward variances and downward departures under U.S.S.G. § 5K2.0 for providing substantial assistance to the government. Sotolongo requested only a downward variance for providing assistance. They all claimed that the government had indicted Angel Calderin, an individual involved in fraud at another pharmacy, based upon information they had provided.

The government opposed the departure and variance requests. With regard to the defendants' substantial assistance argument, the government explained that it had not relied on any information they provided to indict Calderin. The government stated that the defendants' conspiracy had actually involved two other pharmacies and a loss amount closer to $3 million. Calderin was involved with one of those other two pharmacies, a fact that the government had learned from bank cards found in Gonzalez's wallet when he was arrested. The government did not file a motion for a downward departure under § 5K1.1 of the guidelines because it believed, contrary to the defendants' claim, that they had hindered parts of its investigation.

The court applied the sophisticated means enhancement and denied the defendants' requests for downward departures and variances. Instead, it gave upward variances to Gonzalez and Sotolongo, leading to sentences of 84 and 72 months, respectively. Valdes was sentenced to 46 months imprisonment, at the top of her guidelines range.

II.

A.

The defendants' first argument on appeal concerns the government's mention at sentencing of the approximately $3 million loss amount from the conspiracy. All three defendants argue that (1) by mentioning that amount the government breached their plea agreements, which stipulated to a loss amount of about $1.3 million, and (2) the district court violated U.S.S.G. § 1B1.8 by considering that $3 million loss amount in imposing an above-guidelines sentence. The defendants ask this Court to vacate their sentences and remand for another district court judge to resentence them or, in the alternative, allow them to withdraw their guilty pleas.

None of the defendants raised these two issues at sentencing.[1] Therefore, we review their contentions only for plain error. See United States v. Romano, 314 F.3d 1279, 1281 (11th Cir. 2002). To prevail, the defendants must establish that (1) an error occurred; (2) that error was plain; (3) it affected their substantial rights; and (4) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. Id. An error is plain only if it is "clear or obvious, rather than subject to reasonable dispute." Puckett v. United States, 556 U.S. 129, 135,

---

[1] Although the defendants assert that they adequately preserved their objections at sentencing, the record does not support that claim.

6

129 S.Ct. 1423, 1429 (2009).  Under that standard, the defendants' argument that the government breached the plea agreements fails because, even if we assume there was error and that it was plain, they have not established that it affected their substantial rights.

Regarding the substantial rights requirement, the defendants have not carried their "heavy burden" of showing a reasonable probability of a different sentence had the government not made the comments that the defendants belatedly challenge.  See United States v. Rodriguez, 627 F.3d 1372, 1382 (11th Cir. 2010). They cannot do so because the district court calculated all of the advisory sentences using the $1.3 million loss amount, and it specifically mentioned the $1.3 million loss amount when it explained its reasoning for imposing the sentences that it did.  In light of those facts, it is not clear that the district court would have imposed different sentences if the government had not mentioned the $3 million loss.  That uncertainty means that the defendants have failed to satisfy the third prong of the plain error standard.  See id. ("[W]here the effect of an error on the result in the district court is uncertain or indeterminate — where we would have to speculate — the appellant has not met his burden of showing a reasonable probability of a different result.") (quotation marks omitted).

The defendants' next contention is that the district court violated U.S.S.G. § 1B1.8.  When the government receives information from a cooperating defendant

7

in exchange for a promise that the information will not be used against that defendant, § 1B1.8 and the relevant guidelines commentary prohibit a sentencing court from using that information to determine the defendant's advisory guidelines range or as a basis for departing upward from that advisory range. U.S.S.G. § 1B1.8; id. cmt. n.1. In contrast, a district court may consider that information in determining whether to grant a downward departure pursuant to a government motion under U.S.S.G. § 5K1.1. Id. § 1B1.8(b)(5). Here, the district court mentioned the $3 million loss only in the context of discussing whether the defendants should receive a downward departure. None of the defendants received an upward departure, and the district court calculated all of the advisory sentences using the loss amount agreed to in the plea agreements. Accordingly, there was no violation of U.S.S.G. § 1B1.8.

## B.

All three defendants contend that the district court erred in applying a 2-level sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(10)(C)[2] when calculating their guidelines sentences. They claim that their scheme did not include sophisticated means, such as the use of offshore accounts or the falsification of physician documents. They also argue that the district court erred

---

[2] The sophisticated means enhancement that the district court applied was in § 2B1.1(b)(9)(C) of the 2010 sentencing guidelines. This provision was moved to § 2B1.1(b)(10)(C) in the 2012 guidelines. The language of the two provisions is the same.

in considering the length of their ongoing fraud in determining that it involved sophisticated means.

We review factfindings related to the district court's imposition of sentencing enhancements under a deferential clear-error standard, while we review de novo the district court's interpretation and application of the sentencing guidelines. United States v. Campbell, 491 F.3d 1306, 1315 (11th Cir. 2007). A district court's finding that a defendant used sophisticated means to commit an offense is a factfinding reviewed only for clear error. United States v. Bane, 720 F.3d 818, 826 (11th Cir. 2013). We will not disturb that finding "unless we are left with a definite and firm conviction that a mistake has been committed." United States v. Clarke, 562 F.3d 1158, 1165 (11th Cir. 2009) (quotation marks omitted).

Section 2B1.1(b)(10)(C) of the sentencing guidelines provides for a 2-level enhancement for an offense that involved "sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). The guidelines commentary defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. cmt. n.8(B). The commentary also provides a list of conduct that falls within the definition, such as "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." Id. That list is not exclusive. Campbell, 491 F.3d at 1316. To decide whether this enhancement is applicable, we look to the

9

sophistication of the overall scheme rather than to that of each individual act committed by a defendant. United States v. Ghertler, 605 F.3d 1256, 1267 (11th Cir. 2010).

We have previously upheld application of the sophisticated means enhancement in a Medicare fraud case where the defendant engaged in "repetitive coordinated conduct" that involved falsifying medical documents and getting medical facilities to assist in creating the appearance that certain treatments were legitimate. Bane, 720 F.3d at 822–23, 826–27. The facts in this case are similar. Over the course of two years, the defendants participated in a conspiracy in which they paid a physician to provide them with fraudulent prescriptions for patients whom the doctor had not treated. The defendants specifically provided the physician with patient information that could be used to write the false prescriptions. This "repetitive coordinated conduct" continued for two years and resulted in the defendants fraudulently billing approximately $1.3 million worth of prescriptions that were never dispensed. The defendants also perpetrated their fraud by using a pharmacy that had been incorporated by a nominee owner, thus shielding the identity of the corporation's true owner, and they used Medicare's intricate lien and reimbursement process to pull off the fraud. In light of those considerations and our deferential standard of review, the district court did not

clearly err in applying the sophisticated means enhancement under the guidelines. See id. at 826.

## C.

Finally, all three defendants argue that the district court's rejection of their requests for a downward variance was an abuse of discretion because the district court categorically refused to even consider a factor — their cooperation with the government — that was relevant to sentencing.[3] That contention is unambiguously contradicted by the record. All three defendants discussed their alleged cooperation with the government at length during their sentence hearing. The district court explicitly noted that it would consider those arguments for purposes of the variance requests, and the court stated that it viewed the alleged cooperation as relevant to the § 3553 factor concerning "the history and characteristics" of the defendants. Accordingly, the district court, in determining the defendants' sentences, did not fail to consider the defendants' alleged cooperation.[4]

---

[3] At sentencing, Gonzalez and Valdes argued that their cooperation warranted a sentencing reduction either as a downward departure under U.S.S.G. § 5K2.0 or as a downward variance under 18 U.S.C § 3553. Sotolongo argued only that his cooperation warranted a downward variance under § 3553. Neither Gonzalez nor Valdes argues on appeal that the district court erred in denying their requests for a downward departure. Therefore, that argument is abandoned. See Norelus v. Denny's, Inc., 628 F.3d 1270, 1297 (11th Cir. 2010).

[4] Valdes' plea agreement included an appeal waiver that applied unless she received a sentence that exceeded the statutory maximum or was the result of an upward departure or variance. Valdes received a within-guidelines sentence, but she argued that we should not enforce her appeal waiver because of due process and equal protection considerations. The government responded in its brief, rather than through a separate motion, that we should dismiss Valdes' appeal because her waiver was valid. We need not decide whether the waiver was valid,

III.

Gonzalez raises one last challenge on appeal concerning remarks the district court made when discussing his criminal history at sentencing.  Those remarks related to Gonzalez's arrival in the United States in 1980 as part of the Mariel boatlift.[5]  First, as the district court began discussing Gonzalez's criminal history in its § 3553 analysis, the court stated that "it appears that [Gonzalez] came to the United States in 1980 during the Mariel boatlift, so I assume he came to the United States illegally."  The district court's second comment came as it finished reviewing Gonzalez's criminal history and closed with the remark that his criminal history characterized "his time in the United States since he came here illegally."  At no point during his sentence hearing did Gonzalez object to those comments.

Gonzalez now contends that the district court's remarks reveal that it erroneously relied on a prejudicial view of Cuban immigrants who came to America during the Mariel boatlift in giving him an above-guidelines sentence.  He claims that the district court's view was erroneous because we have previously

---

however, because we reject the defendants' arguments on appeal and affirm their sentences, mooting the appeal waiver issue.

[5] The Mariel boatlift refers to the exodus of approximately 114,000 Cuban refugees, in nearly 1,800 boats, from Cuba to the United States in 1980.  See United States v. Frade, 709 F.2d 1387, 1389 (11th Cir. 1983).  Although the Carter Administration was initially receptive to granting some of those refugees political asylum, see id., it eventually changed its position and instituted a blockade to prevent boats from leaving the United States to pick up Cuban refugees and bring them here.  See Pollgreen v. Morris, 496 F. Supp. 1042, 1047 (S.D. Fla. 1980).

12

held that the Mariel boatlift was not illegal.[6]  Based on that contention, Gonzalez asks us to vacate his sentence and remand to a different district court judge for resentencing.

Because Gonzalez did not object at sentencing, we review the district court's actions only for plain error.  Rodriguez, 627 F.3d at 1380.  Accordingly, Gonzalez must show that "(1) an error occurred; (2) the error was plain; (3) it affected [his] substantial rights; and (4) it seriously affected the fairness of the judicial proceedings."  Id. (quotation marks omitted).

Assuming the district court's comments were erroneous, Gonzalez "must establish a reasonable probability of a different result but for the error" in order to show that the district court's actions affected his substantial rights.  Id. at 1382 (quotation marks omitted).  He cannot meet that burden.  The court's belief that Gonzalez arrived in the United States illegally was only one of many considerations it took into account when evaluating his criminal history.  The court also considered Gonzalez's convictions for armed burglary, armed robbery, and armed kidnapping, as well as an arrest for another armed robbery.  It was those

---

[6] The decisions Gonzalez cites for this proposition dealt with the criminal convictions of Americans who helped to bring Cuban immigrants from Havana to the United States as part of the boatlift.  See United States v. Frade, 709 F.2d 1387 (11th Cir. 1983); United States v. Zayas-Morales, 685 F.2d 1272 (11th Cir. 1982).  Those decisions do not give us any indication of Gonzalez's immigration status when he arrived in the United States.  Because it does not affect the outcome of this appeal, however, we will assume that Gonzalez came to the United States legally.

13

violent offenses, not Gonzalez's alleged illegal arrival in the United States, that the district court referred to when it stated that Gonzalez had demonstrated "disrespect for [the] law."[7]  In addition, the court's decision to impose an upward variance was based not only on his prior criminal history but also on the characteristics of the present offense.  In light of these considerations, Gonzalez cannot show a reasonable probability that he would have received a different sentence "but for the sentencing judge's comments about how [Gonzalez] came to be in this country or but for the thoughts underlying those comments."  Rodriguez, 627 F.3d at 1382.

**AFFIRMED**.

---

[7] What the district court actually said was: "He has demonstrated a disrespect for law including a violent conviction for armed robbery, bank robberies, and kidnapping."

14