[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 13, 2007
THOMAS K. KAHN
CLERK

No. 06-13548

_____

D. C. Docket No. 04-00424-CR-RWS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM C. CAMPBELL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 13, 2007)**

Before DUBINA and BLACK, Circuit Judges, and RESTANI,*Judge.

DUBINA, Circuit Judge:

_____

*Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

Appellant William C. Campbell appeals his convictions and sentences for tax fraud. On appeal, Campbell raises the following issues: (1) whether the district court abused its discretion and violated Campbell's Sixth Amendment right to counsel when it disqualified his counsel of choice; and (2) whether the 30-month concurrent prison sentences Campbell received were unreasonable. For the reasons that follow, we affirm the convictions and sentences.

## I. BACKGROUND

From 1994 to 2002, Campbell served as mayor of the City of Atlanta, Georgia ("City"). Approximately two and a half years after Campbell left office, a federal grand jury issued an indictment charging him with (1) having conducted City affairs through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (2000) (count one); (2) accepting cash payments with the intent to be influenced and rewarded in connection with City business transactions, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2 (2000) (counts two through four); and (3) tax fraud, in violation of 26 U.S.C. § 7206(1) (2000) (counts five through seven).

According to the indictment, while in office, Campbell solicited and accepted undocumented payments of money from individuals and businesses seeking to do business with the City and treated favorably those who paid. One of

the more notable transactions involved $55,000 Campbell received in exchange for an award of lucrative contracts concerning the City's computer systems. Another involved payments Campbell received from a night club owner with the understanding that Campbell would approve the owner's application for a liquor license. Among other things, the indictment also accused Campbell of hiring an assistant on the City payroll to tend to his personal needs, including collecting corrupt payments on Campbell's behalf.

The indictment further charged that Campbell actively sought to conceal the payments he received, which included supposed campaign contributions that he utilized for frivolous personal expenses. In carrying out his corrupt activities, Campbell committed mail and wire fraud. Furthermore, he under-reported his income to the IRS from tax years 1997 through 1999.

It is difficult to overemphasize the breadth and depth of the corruption underlying the case against Campbell. At the time of Campbell's sentencing, five high-level officials in his former administration and five businessmen were ensnared in the government's investigation of Campbell and either pled guilty or were convicted of charges similar to those Campbell faced. All but two received prison sentences. Others charged with wrongdoing, including one businessman

who admitted bribing Campbell, struck deals with the government to avoid prosecution.

Early in the proceedings leading to Campbell's trial, after already having secured legal representation, Campbell sought to retain an additional attorney, Craig A. Gillen ("Gillen"). The government quickly opposed Gillen's representation because Gillen's law partner, Wilmer Parker ("Parker"), had represented businessman George Greene on corruption charges related to those Campbell faced. The government intended to call Greene ("Greene"), who had pled guilty and been sentenced to 15 months in prison, as a witness in its case against Campbell. Therefore, the government argued, Gillen's representation would create a conflict of interest. The district court agreed and disqualified Gillen.

Following a trial, the jury acquitted Campbell of the RICO and bribery charges but found Campbell guilty of the tax fraud charges.[1] After a sentencing hearing, the district court sentenced Campbell to 30 months in prison and 12

---

[1]Notably, in addressing the RICO charge on the verdict form, the jury indicated that it found Campbell guilty of the predicate act of mail fraud in connection with solicitation of campaign contributions. The indictment had not charged Campbell separately for that crime, however.

months on supervised release, in addition to a fine of $6,000. Campbell then perfected this appeal.

## II. DISCUSSION

### A. Gillen's Disqualification

Campbell contends that the district court's decision to disqualify Gillen violated his Sixth Amendment right to counsel of his choice. Specifically, Campbell contends that a court's interest in maintaining public confidence in the criminal justice system is insufficient in general and was not sufficiently at risk in this case to justify disqualifying Gillen when (1) Gillen had not represented Greene; (2) Gillen possessed no confidential information about Greene; and (3) Campbell had knowingly and voluntarily waived any potential conflict of interest. Campbell also contends that the district court erroneously failed to consider alternatives to disqualification.

"A trial court's decision to disqualify the defendant's counsel is reviewed for abuse of discretion." *United States v. Ross*, 33 F.3d 1507, 1522 (11th Cir. 1994) (citing *Wheat v. United States*, 486 U.S. 153, 163-64, 108 S. Ct. 1692, 1699-1700 (1988)). In applying the abuse of discretion standard, we recognize that a district court has a "a range of choice[,] . . . and so long as its decision does not amount to a clear error of judgment we will not reverse even if we would have

5

gone the other way had the choice been ours to make." *McMahan v. Toto*, 256 F.3d 1120, 1128 (11th Cir. 2001).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "[A]n essential part of that right is the accused's ability to select the counsel of his choice." *Ross*, 33 F.3d at 1522. "Thus, a criminal defendant has a presumptive right to counsel of choice." *Id.*

Nevertheless, "while the right to . . . be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159, 108 S. Ct. at 1697. Thus, a defendant's right to the counsel of his choice is not absolute. *Id.* (noting some of the circumstances in which the right to counsel of choice is "circumscribed"); *see also Ross*, 33 F.3d at 1523.

"The need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial." *Id.* Emphasizing the

judiciary's interest in ensuring and maintaining the integrity of our judicial system, the U.S. Supreme Court held in *Wheat* that "where a court justifiably finds an actual conflict of interest, *there can be no doubt that it may decline a proffer of waiver . . . .*" 486 U.S. at 162, 108 S. Ct. at 1698 (emphasis added).[2]  Importantly, for the purpose of the instant case, "if one attorney in a firm has an actual conflict of interest, we impute that conflict to all the attorneys in the firm, subjecting the entire firm to disqualification." *Ross*, 33 F.3d at 1523 (citing *United States v. Kitchin*, 592 F.2d 900, 904 (5th Cir. 1979)).[3]

Because we are dealing here with an imputed conflict, it is not necessary to decide whether Gillen himself had a direct conflict of interest.  We inquire instead whether Gillen's law partner, Parker, would have had an actual or serious potential conflict of interest had Campbell retained him.

In deciding whether the actual or potential conflict warrants disqualification, we examine whether the subject matter of the first

---

[2]Campbell's assertions to the contrary notwithstanding, *United States v. Gonzalez-Lopez*, 548 U.S. ____, 126 S. Ct. 2557 (2006), did not deflate the *Wheat* opinion's emphasis on the need to balance the right to counsel of choice with the need to ensure the integrity of the criminal justice system and the public appearance of fairness.  In fact, *Gonzalez-Lopez* expressly reemphasized the point and stated, "Nothing we have said today casts any doubt or places any qualification upon our previous holdings that limit the right to counsel of choice . . .."  548 U.S. at ___, 126 S. Ct. at 2565.  The Court further noted that "[n]one of these limitations on the right to choose one's counsel is relevant here." *Id.* at 2566.

[3]This court adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

7

representation is substantially related to that of the second. *Kitchin*, 592 F.2d at 904; *see United States v. James*, 708 F.2d 40, 46 (2d Cir. 1983). Our goal is to discover whether the defense lawyer has divided loyalties that prevent him from effectively representing the defendant. *See United States v. Moscony*, 927 F.2d 742, 750 (3d Cir.), *cert. denied*, 501 U.S. 1211, 111 S. Ct. 2812, 115 L. Ed. 2d 984 (1991). If the conflict *could* cause the defense attorney improperly to use privileged communications in cross-examination, then disqualification is appropriate. Indeed, it is also true that disqualification is equally appropriate if the conflict *could* deter the defense attorney from intense probing of the witness on cross-examination to protect privileged communications with the former client or to advance the attorney's own personal interest. In short, *the court must protect its independent interest in ensuring that the integrity of the judicial system is preserved and that trials are conducted within ethical standards.*

*Ross*, 33 F.3d at 1523 (emphasis added).

We are faced in the instant case with the same concerns we discussed in

*Ross*, which upheld the district court's decision to disqualify the criminal

defendant's counsel of choice. *Id.* at 1523-24. Without doubt, Parker, who

defended Greene against criminal charges arising from the same corruption

charges leveled against Campbell, would have had an actual conflict of interest

that would warrant disqualification. *See id.*; *see also Wheat*, 486 U.S. at 163-64,

108 S. Ct. at 1699-1700 (upholding a district court's decision to disqualify an

attorney who had represented a co-conspirator whom the government intended to

8

call as a witness). Indeed, Campbell does not argue otherwise. Consequently,

Gillen, too, suffered from the same conflict of interest.[4]

While it is true that Campbell was free to waive the conflict, the district

court was not required to accept his waiver. *Ross*, 33 F.3d at 1524.[5] Unlike in

*Ross*, where all of the relevant co-defendants waived any potential conflict,

Greene refused to waive the attorney-client privilege, which means that the instant

case presents a stronger justification for disqualification than even *Ross*. By

disqualifying Gillen, the district court chose to avoid a situation in which the

---

[4]Campbell's arguments to some extent conflate the existence of a direct or indirect conflict with the existence of an actual or potential conflict. The fact that an imputed conflict is, by definition, an indirect conflict does not mean that an imputed conflict is somehow merely a potential conflict. In the instant case, as a matter of law, Parker's actual conflict was imputed to and, therefore, became Gillen's *actual* conflict. *See Freund v. Butterworth*, 165 F.3d 839, 863 n.33 (11th Cir. 1999) (noting that a conflict of one member of a law firm "imputes equally" to the rest of the law firm). Consequently, Campbell's reliance on our opinion in *In re Paradyne Corp.*, 803 F.2d 604 (11th Cir. 1986), to the extent that *Paradyne* addressed potential, as opposed to actual, conflicts is misplaced.

*Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.* ("*Bayshore*"), 380 F.3d 1331 (11th Cir. 2004), on which Campbell also relies, is inapposite as well. In *Bayshore*, we dealt with an allegation of a conflict arising from dual representation, but the attorney promptly withdrew from representing one of the parties, whom he had previously represented only in "*unrelated* matters." *Id.* at 1338 (emphasis added).

[5]Although *dicta* in *Paradyne* may leave the impression that Gillen's conflict may be resolvable with a waiver from Campbell, *see* 803 F.2d at 610, n.18, the scope of the district court's discretion to disqualify an attorney under these circumstances simply was not at issue in *Paradyne*. *See generally id.* The opinions expressed by the U.S. Supreme Court and this court in *Wheat* and *Ross*, respectively, both of which were issued after *Paradyne*, control the outcome in this case.

fairness of Campbell's trial undoubtedly and quite legitimately would have been called into account, whether by Campbell or by Greene. *Wheat* and *Ross* make it clear that such a choice is within the district court's discretion.[6]

Campbell also contends that the district court failed to properly consider alternatives to disqualification that may have remedied the conflict of interest. The record does not support Campbell's argument. The district court clearly and carefully considered Campbell's proposed measures, and its decision not to implement them was well-reasoned. Assuming, without deciding, that the district court was required to consider alternatives in these circumstances, the district court undoubtedly satisfied its obligation to do so. Therefore, we hold that the district court did not abuse its discretion when it disqualified Gillen.

## B.    **Campbell's Sentences**

Following Campbell's trial, the district court held a sentencing hearing at which, after receiving evidence, the district court sentenced Campbell to 30 months in prison (30 months on each count to run concurrently) and 12 months on

---

[6]The *Wheat* Court relied on rules governing attorney conduct to establish the relevant "standards of the profession." 486 U.S. at 160, 108 S. Ct. at 1698. Therefore, we note that our holding in this case is entirely consistent with the Georgia Rules of Professional Conduct. *See* Ga. Rules of Prof'l Conduct 1.9, 1.10 (addressing, respectively, conflicts arising from the representation of a former client and imputation of conflicts of interest).

10

supervised release, in addition to a $6,000 fine. To clarify the rationale supporting the sentences, the district court issued a detailed sentencing order.

After explicitly addressing and disposing of Campbell's numerous objections to the U.S. Probation Office's pre-sentence investigation report, the district court turned its attention to the U.S. Sentencing Commission Guidelines Manual ("U.S.S.G." or "the Guidelines"). Relying on the 1998 edition of the Guidelines, which correlates the relevant base offense level to the amount of tax loss to the government, the district court determined that Campbell's base offense level was 13. *See* U.S.S.G. § 2T1.1(a)(1).[7] The court then added a total of six levels: two for failing "to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity," *see* U.S.S.G. § 2T1.1(b)(1); two for utilizing "sophisticated means" to impede discovery of the existence or extent of his fraud, *see* U.S.S.G. § 2T1.1(b)(2); and two for obstruction of justice, *see* U.S.S.G. § 3C1.1. The district court declined the government's requests for an increase in the base offense level for abuse of a position of trust, *see* U.S.S.G. § 3B1.3, and disruption of governmental function, *see* U.S.S.G. § 5K2.7. However, the district court also denied Campbell's request for a downward departure based on his public service. *See* U.S.S.G. § 5H1.11 (stating that public service is "not

_____

[7]Citations refer to the 1998 edition of the Guidelines.

11

ordinarily relevant in determining whether a departure is warranted"). Thus, the district court determined that Campbell's offense level was 19 and that Campbell fell within criminal history category I, the lowest of the criminal history categories. Consequently, the Guidelines recommended prison sentences ranging from 30 to 37 months.

Following its assessment of the Guidelines range, the district court expressly considered the additional factors set forth in 18 U.S.C. § 3553 (2000), though it limited its detailed discussion to those factors found to be "of particular importance." *United States v. Campbell*, No. 1:04-CR-0424-RWS, slip op. at 25 (N.D. Ga. June 15, 2006) (sentencing order). The district court found that Campbell had publicly sought to "minimize his crimes" and "his culpability for the crimes" for which he was convicted and noted the need to deter public officials in particular from criminal conduct. *Id.* at 25-27. Nevertheless, the district court imposed only the minimum sentences recommended by the Guidelines. At the sentencing hearing, the district court acknowledged Campbell's accomplishments as mayor and his devotion to his children. The district court's sentencing order clearly indicates that the district court also considered "sentences imposed upon other defendants who were prosecuted as part of this same investigation," the

circumstances surrounding the related convictions, and "sentences that are generally imposed for tax offenses." *Id.* at 27.

Campbell challenges several aspects of the sentences imposed by the district court. First, Campbell contends that the district court committed several errors in calculating the appropriate Guidelines range and settling on the sentences ultimately issued. Thus, Campbell contends, his sentences are procedurally unreasonable. Lastly, Campbell contends that the circumstances of this case render his sentences substantively unreasonable.

"We review the sentence imposed by the district court for reasonableness." *United States v. Talley*, 431 F.3d 784, 785 (11th Cir. 2005). "Review for reasonableness is deferential. We must evaluate whether the sentence imposed by the district court fail to achieve the purposes of sentencing stated in section 3553(a)." *Id.* at 788. "We do not apply the reasonableness standard to each individual decision made during the sentencing process; rather, we review the final sentence for reasonableness." *United States v. Winingear*, 422 F.3d 1241, 1245 (11th Cir. 2005). "[T]he party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both th[e] record and the factors in section 3553(a)." *Talley*, 431 F.3d at 788.

We do not in this circuit presume reasonable a sentence within the properly calculated Guidelines range. *See United States v. Hunt*, 459 F.3d 1180, 1185 (11th Cir. 2006). Recently, however, the U.S. Supreme Court upheld other circuits' decisions affording such a presumption, noting that a sentence, independently calculated by the district court in accordance with *Booker*, that falls within the properly calculated Guidelines range "significantly increases the likelihood that the sentence is a reasonable one." *Rita v. United States*, 551 U.S. ___, slip op. at 8 (June 21, 2007).[8]

"After *Booker*, a sentence may be reviewed for procedural or substantive unreasonableness." *Hunt*, 459 F.3d at 1182 n.3; *see also United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005). A sentence may be procedurally unreasonable if "it is the product of a procedure that does not follow *Booker*'s requirements, regardless of the actual sentence." *Id.*[9] "Additionally, a sentence may be substantively unreasonable, regardless of the procedure used." *Id.*

1.      **Procedural Unreasonableness**

_____

[8]We recognize that the Court's rationale in *Rita* calls into question our reasons for not affording a presumption of reasonableness. *Contrast Rita*, 551 U.S. ___, slip op. at 7-16, *with Hunt*, 459 F.3d at 1185.

[9]*Booker* requires courts to consider the sentence recommended by the Guidelines as one of several factors mentioned in 18 U.S.C. § 3553. 543 U.S. at 264-65, 125 S. Ct. at 767-68; *see also Hunt*, 459 F.3d at 1184-85.

14

Campbell first contends that the district court's reliance on conduct forming the basis of criminal charges on which he had been acquitted was unconstitutionally excessive. Campbell does not contend that the evidence was insufficient to support the district court's relevant factual findings. Furthermore, Campbell concedes that our precedents have consistently upheld district courts' use of such relevant conduct when determining an appropriate sentence. *See*, *e.g.*, *United States v. Duncan*, 400 F.3d 1297, 1304 (11th Cir. 2005) (citing cases in this circuit extending as far back as 1991). Campbell contends nonetheless that the extent of the district court's reliance on his acquitted conduct violated his constitutional rights.

"We review *de novo* constitutional challenges to a sentence." *United States v. Cantellano*, 430 F.3d 1142, 1144 (11th Cir. 2005), *cert. denied*, 547 U.S. 1034, 126 S. Ct. 1604 (2006).

Campbell argues that in light of the U.S. Supreme Court's holdings in *Booker* and *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), there must exist limits on a district court's ability to rely on acquitted conduct, and the district court exceeded those limits in this case. We do not quibble with Campbell's premise that the Constitution limits courts' ability to calculate a prison sentence in part on the basis of acquitted conduct. Indeed, we acknowledged as

15

much in *Duncan* when we noted that "*Booker* does not suggest that the consideration of acquitted conduct violates the Sixth Amendment *as long as the judge does not impose a sentence that exceeds what is authorized by the jury verdict*." 400 F.3d at 1304 (emphasis added). Campbell has failed to cite, and we are independently unaware of, controlling authority establishing additional limits, assuming the conduct relied upon is relevant.[10] Campbell's reliance on *Blakely* and *Booker* is misplaced. Our opinion in *Duncan* was issued subsequent to both *Blakely* and *Booker*, and we then held that "nothing in *Booker* erodes our [relevant] binding precedent." 400 F.3d at 1304-05.[11]

Campbell was convicted on three counts of tax fraud, as that offense is defined in 26 U.S.C. § 7206 (2000). Section 7206 provides for a maximum three-year prison sentence and $100,000 fine. Campbell's concurrent 30-month prison sentences and $6,000 fine do not exceed the maximum "authorized by the jury

___

[10]To the extent that Campbell's brief could possibly be interpreted as arguing that the conduct upon which the district court relied was not sufficiently relevant to the charge for which he was convicted (Appellant's Br. at 41), his assignment of error, which is implicit at best, is insufficient for the purpose of appellate review. *See*, *e.g.*, *United States v. Gupta*, 463 F.3d 1182, 1195 (11th Cir. 2006) (deeming waived an appeal that lacked argument and citation to legal authority), *cert. denied*, 75 U.S.L.W. 3585 (May 21, 2007) (No. 06-1388).

[11]The U.S. Supreme Court in *Rita* reaffirmed our view that *Booker* and *Blakely* do not limit the district courts' ability to consider for sentencing purposes facts proven to the judge by a preponderance of the evidence so long as the sentence imposed does not exceed the maximum permitted by the jury verdict. *Rita*, 551 U.S. ___, slip op. at 13, 14 (discussing parenthetically the relevant holdings in *Booker* and *Blakely*).

verdict;" therefore, we conclude that the district court's reliance on acquitted conduct did not violate Campbell's constitutional rights. On the contrary, given the circumstances of this case, the district court's decision to allow Campbell's three sentences to run concurrently and to impose a fine of only $6,000 demonstrates considerable leniency and restraint. *See*, *e.g.*, *United States v. Tafoya*, 757 F.2d 1522, 1530 (5th Cir.) (upholding a sentence totaling six years on two counts of tax fraud), *cert. denied*, 474 U.S. 921, 106 S. Ct. 252 (1985).

Campbell further argues that the district court failed to properly consider the central mandate of the key sentencing statute, 18 U.S.C. § 3553 (2000), as well as the factors addressed in § 3553 that are independent of the Guidelines. Finally, Campbell contends that the district court erroneously calculated the Guidelines range. We begin our analysis with the district court's calculation of the Guidelines range.

"We review for clear error the district court's findings of fact regarding whether a defendant should receive an enhanced sentence under the . . . Guidelines." *United States v. Clay*, 376 F.3d 1296, 1300 (11th Cir. 2004). We review *de novo* the "district court's interpretation of the Guidelines and its application of the Guidelines to the facts." *United States v. McGill*, 450 F.3d 1276, 1278 (11th Cir. 2006).

In a footnote in his brief, Campbell contends that the district court incorrectly determined the amount of tax loss that led to the base offense level. Campbell's argument, however, is nothing more than an assignment of error. He cites to no authority, legal or otherwise, for his parenthetical suggestion that the district court's tax loss calculation was not "a reasonable estimate." (Appellant's Br. at 51 (citing U.S.S.G. § 2T1.1, commentary (n.1).) Therefore, Campbell has failed to raise this argument in a manner sufficient to allow for appellate review. *Gupta*, 463 F.3d at 1195.

Campbell also contends that the evidence did not demonstrate that he utilized sophisticated means to conceal the crime for which he was convicted. The district court found that Campbell utilized campaign accounts and credit cards issued to other people to conceal cash expenditures in "a deliberate attempt to impede the discovery of both the existence and extent of his tax fraud." Campbell suggests that the evidence demonstrates merely "unusual spending patterns." (Appellant's Br. at 52, n.20.) In light of the evidence before the district court, we believe it was reasonable for the district court to conclude that Campbell engaged in his "unusual spending patterns" to conceal his fraud on the government. *See United States v. Barakat*, 130 F.3d 1448, 1457 (11th Cir. 1997) (agreeing with the district court's determination that the defendant's practice of filtering funds

18

through his attorney's trust account constituted a sophisticated means of concealing tax evasion).[12]  Furthermore, Campbell's deceptive practices were at least as sophisticated as the practice at issue in *Barakat*.  The fact that Campbell did not use offshore bank accounts or transactions through fictitious business entities is unavailing.  *See* U.S.S.G. § 2T1.1, commentary (n.4) (providing a nonexclusive list of examples of sophisticated means of concealment).  In terms of the sophistication of the concealment, we see no difference between "hiding assets or transactions . . . through the use of fictitious entities, corporate shells, or offshore financial accounts," *id.*, and hiding assets or transactions through the use of a straw man or campaign fund.

Finally, with respect to the district court's Guidelines calculation, Campbell contends that the evidence was insufficient to demonstrate that he willfully obstructed justice.  *See* U.S.S.G. § 3C1.1.  We disagree.  At the sentencing hearing, the district court heard testimony from Gabe Pascarella ("Pascarella"), a person of interest to the government during its investigation of Campbell.  Pascarella testified that he had notified Campbell of the government's intention to

---

[12]In *Barakat*, we vacated the defendant's sentence because it was not clear whether the district court had applied a sophisticated means enhancement to the base offense level with respect to the tax evasion conviction, which we determined would not have been clear error, or with respect to the mail fraud charge, which we concluded would have been error.  130 F.3d at 1457-58.

19

interview him, and, together, they planned to have Pascarella surreptitiously record the interview. Following the government's interview, Campbell met with Pascarella, and the two discussed the interview as well as a subpoena the government had issued to Pascarella requiring him to produce documents related to the investigation. Pascarella informed Campbell that he possessed relevant records that would, *inter alia*, evidence Campbell's use of Pascarella's credit card to pay personal expenses. At Campbell's request, Pascarella turned some of the records over to him. The government did not become aware of the records Pascarella gave Campbell until after the trial.

The only evidence rebutting Pascarella's testimony at the sentencing hearing was an affidavit from Campbell stating that he had not taken any records. The district court chose to believe Pascarella's testimony, however, which, unlike Campbell's sworn statement, was subject to cross-examination, and Campbell has failed to argue that its decision to do so was clearly erroneous. Given the district court's unchallenged credibility determination, we conclude that the evidence upon which the district court relied was sufficient to demonstrate that Campbell took the records from Pascarella with the intent to "conceal[] . . . evidence that is material to an official investigation." *See* U.S.S.G. § 3C1.1, commentary (n.4(d)) (providing examples of conduct that qualifies as obstruction of justice).

20

Therefore, the district court's decision to add two levels to the base offense level for obstruction of justice was not error.

We conclude that the remainder of Campbell's arguments regarding procedural reasonableness are lacking in merit. It is clear not only that the district court adequately considered the § 3553 factors, but also that the sentences handed down were the product of conscientious deliberation. While we remain uncertain whether the sentences are "sufficient . . . to comply with the purposes" of sentencing, considering as we must the factors set forth in § 3553, we are certain that they are "not greater than necessary." *See* 18 U.S.C. § 3553. Therefore, the district court adhered to the relevant aspect of § 3553's central mandate.[13]

In conclusion, we hold that the district court properly followed the procedures outlined in *Booker*. Therefore, Campbell's sentences are not procedurally unreasonable.

## 2. <u>Substantive Unreasonableness</u>

Campbell asks this court to overturn his sentences due to (1) his status as a "first offender with an exceptional personal history who cannot be considered likely to commit further crimes," (2) his service to the public, and (3) statistics that

_____

[13]The government did not file a cross-appeal of Campbell's sentences. Therefore, we need not decide whether the sentences are sufficient to comply with the purposes of sentencing as set forth in § 3553.

indicate that Campbell's sentences greatly exceed the average sentences imposed upon those convicted of tax crimes. We decline to do so.

That Campbell has been convicted only once does not make him a first offender. He was convicted on three separate counts of tax fraud, which he engaged in on three separate occasions over the course of three years. He sought to conceal his crimes and willfully impeded the government's efforts to prosecute him. Moreover, the fact that Campbell, a lawyer and former federal prosecutor, committed his crimes while mayor of a major metropolitan city, knowing as he must have that his actions would be publicly and deeply scrutinized, belies his assertion that he "cannot be considered likely to commit further crimes." Further, Campbell has failed to direct this court to evidence that his public service was so extraordinary as to justify deviating from the standard application of the Guidelines, which generally precludes consideration of public service. U.S.S.G. § 5H1.11. Finally, the statistics Campbell cites are bare numbers without context and, therefore, do not persuade us that his sentences are unreasonable.

Briefly, we address Campbell's contention that his sentences reflect disrespect for the jury trial system. Obviously and mistakenly equating acquittal

to innocence,[14] Campbell contends that the district court circumvented the jury's decision to acquit him with respect to the more egregious charges by "essentially convict[ing] Campbell of corruption and sentenc[ing] him as if the jury's acquittal was of no moment." (Reply Br. at 17.) As the district court noted, the record evidences Campbell's failure or refusal to seriously acknowledge his wrongdoing or the potential consequences arising therefrom, not only to himself but also to the people of the City of Atlanta. In light of the evidence that Campbell did what the government says he did, his belief that he is currently imprisoned for acquitted criminal charges further underscores his failure to recognize the gravity of his situation. Had he been convicted of one of the bribery charges, Campbell would have faced up to 10 years in prison. 18 U.S.C. § 666(a) (2000). Had he been convicted of one of the RICO charges, Campbell would have faced up to 20 years in prison. *See* 18 U.S.C. § 1963(a) (2000). And, had the government charged him separately for mail fraud, of which the jury did find Campbell guilty, he likewise would have faced up to 20 years in prison. 18 U.S.C. § 1341 (2000). Campbell's sentences, which are considerably less than the maximum allowed for

---

[14]"[A]n acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361, 104 S. Ct. 1099, 1104 (1984), *quoted in United States v. Watts*, 519 U.S. 148, 155, 117 S. Ct. 633, 637 (1997).

the crimes for which he was convicted, do not amount to sentences for the crimes for which he was not convicted.

We have thoroughly reviewed the record on appeal and have considered all of the applicable factors set forth in 18 U.S.C. § 3553, as did the district court. After careful consideration, we conclude that Campbell's sentences are substantively reasonable.

## III.  CONCLUSION

We conclude that the district court did not abuse its discretion when it disqualified Campbell's counsel.  Further, Campbell's sentences are both procedurally and substantively reasonable.  Accordingly, we affirm Campbell's convictions and sentences.

**AFFIRMED.**