[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10740
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cr-20712-FAM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES M. SCHNEIDER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 22, 2021)

Before WILSON, JILL PRYOR and MARCUS, Circuit Judges.

PER CURIAM:

James Schneider, a securities law attorney, appeals his convictions for conspiracy to commit securities and wire fraud, in violation of 18 U.S.C. § 1349; securities fraud, in violation of 18 U.S.C. § 1348; wire fraud, in violation of 18

U.S.C. § 1343; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. § 1957. This case arises out of a seven-year fraud scheme involving the creation of about 20 fraudulent companies and causing millions of dollars of investor losses, wherein each company followed the same basic four-step lifecycle. The first step was the creation of a bogus shell company. In the next step, Schneider and his coconspirators filed false and fraudulent registration statements on behalf of the bogus company with the Securities and Exchange Commission ("SEC"). Third, the defendants would locate a buyer for the fraudulent company and its shares. Finally, the shell buyer would engage in a pump-and-dump stock swindle, fraudulently inflating the company's stock price, through, e.g., false and misleading press releases, and then selling the company's free-trading shares to innocent investors for substantial financial gain.

On appeal, Schneider argues that the district court: (1) abused its discretion by disqualifying two of his three lawyers; (2) plainly erred by allowing prosecutorial misconduct during closing argument; (3) erred in its sentencing calculations; (4) abused its discretion by rejecting his vindictive prosecution claim; (5) plainly erred by failing to consider certain relevant factors at sentencing; and (6) plainly erred in its forfeiture determinations. After careful review, we affirm.

We review a district court's disqualification of a criminal defendant's lawyer for abuse of discretion, and will reverse only if there was a clear error in judgment.

2

United States v. Campbell, 491 F.3d 1306, 1310 (11th Cir. 2007).  We also review

a prosecutorial vindictiveness claim for abuse of discretion.  United States v. Jones,

601 F.3d 1247, 1260 (11th Cir. 2010).  We review a prosecutorial misconduct claim

for plain error if a defendant did not object to the error at trial.  United States v. Sosa,

777 F.3d 1279, 1294 (11th Cir. 2015).  To prove plain error, the defendant must

show (1) an error, (2) that is plain, and (3) that affected his substantial rights.  United

States v. Turner, 474 F.3d 1265, 1276 (11th Cir. 2007).  If the defendant satisfies

these prongs, we may exercise our discretion to correct the error only if it seriously

affects the fairness, integrity or public reputation of judicial proceedings.  Id.

We review a district court's interpretation and application of the Sentencing

Guidelines de novo, including its legal conclusions about forfeiture.  United States

v. Waked Hatum, 969 F.3d 1156, 1161-62 (11th Cir. 2020); United States v.

Barrington, 648 F.3d 1178, 1194-95 (11th Cir. 2011).  We review for clear error the

district court's findings of fact, including its loss determinations.  Barrington, 648

F.3d at 1197.  We will find clear error only if, upon reviewing the record as a whole,

we are left with the definite and firm conviction that a mistake has been committed.

Id.  We review the district court's calculation of restitution value for abuse of

discretion and its factual findings underlying the restitution order for clear error.

United States v. Valladares, 544 F.3d 1257, 1269 (11th Cir. 2008).  Finally, we

review the sentence a district court imposes for "reasonableness," which "merely

3

asks whether the [] court abused its discretion." United States v. Pugh, 515 F.3d 1179, 1189 (11th Cir. 2008) (quotations omitted). Again, however, we review for plain error issues raised for the first time on appeal, including challenges to procedural reasonableness. United States v. Innocent, 977 F.3d 1077, 1081 (11th Cir. 2020); United States v. Vandergrift, 754 F.3d 1303, 1307 (11th Cir. 2014).

First, we are unpersuaded by Schneider's claim that the district court abused its discretion by disqualifying two of his three attorneys. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. While a defendant has a right to be represented by his counsel of choice, this right is not absolute. United States v. Ross, 33 F.3d 1507, 1522-23 (11th Cir. 1994). In deciding whether to disqualify a defendant's counsel of choice, a court must balance two Sixth Amendment rights: (1) the right to be represented by counsel of choice and (2) the right to a defense conducted by a conflict-free attorney. Id. at 1523. "The need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial." Id.

District courts must recognize a presumption in favor of a defendant's counsel of choice, but this presumption may be overcome by a showing of actual conflict or

4

serious potential for conflict.  Wheat v. United States, 486 U.S. 153, 164 (1988) ("The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.").  To decide if a conflict warrants disqualification, we examine whether the subject matter of the first representation is substantially related to that of the second.  Ross, 33 F.3d at 1523. We seek "to discover whether the defense lawyer has divided loyalties that prevent him from effectively representing the defendant."  Id.  Disqualification may be proper if a conflict could deter an attorney "from intense probing of the witness on cross-examination to protect privileged communications with the former client or to advance the attorney's own personal interest."  Id.  Further, if one attorney in a law firm has a conflict of interest, this conflict is imputed to all attorneys in the firm.  Id.

In cases where an actual conflict would subject an attorney to disqualification, a client may waive this conflict, so long as the waiver is knowing, intelligent and voluntary.  Id. at 1524.  However, even if all affected clients waive a conflict of interest, a district court may, in its discretion, disqualify the conflicted counsel.  See Wheat, 486 U.S. at 160, 162.  This is because "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  Id. at 160.  Therefore, district courts have "substantial latitude" to refuse a client's waiver "not only in those rare cases where an actual conflict may be demonstrated

5

before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Id. at 163.

In Ross, we affirmed a district court's determination that a defendant's lawyer of choice "suffered insurmountable conflict of interest problems" when that lawyer's law partner had represented a government witness in a prior, related action. 33 F.3d at 1522-23. There, the witness had paid a retainer to the lawyer, and testimony about that transaction "would have opened the door to potential conflict, as defense counsel could either have tread dangerously close to confidential matters in attempting to explain this transaction or, alternatively, could have improperly avoided related issues." Id. at 1523. We held that, despite the defendant's waiver of the conflict, the district court did not abuse its discretion by failing to accept the waiver when there were many actual or potential conflicts of interest that could have impeded the trial and undermined the integrity of the judicial system. Id. at 1524.

Similarly, we held in Campbell that the district court did not abuse its discretion by disqualifying the defendant's counsel of choice when the attorney's law partner had represented another defendant who had pled guilty to charges arising out of the same criminal activity and was cooperating as a government witness in the defendant's case. Campbell, 491 F.3d at 1309, 1312. We noted that the defendant's counsel of choice had a conflict, that the district court was not required to accept the defendant's waiver of the conflict, and that the other defendant's refusal

6

to waive the conflict presented a stronger justification for disqualification than in Ross. Id. at 1312. Although the defendant had obtained the disqualified attorney "after already having secured legal representation," id. at 1309, we did not mention this fact in our analysis, see id. at 1311-12. However, in United States v. Hobson, we observed that the district court's order disqualifying the defendant's attorney "only partially affected" the defendant's right to his counsel of choice because this order did not deprive him of the continued representation of a second attorney whom he had retained as counsel. 672 F.2d 825, 829 & n.* (11th Cir. 1982), abrogated on other grounds by Flanagan v. United States, 465 U.S. 259 (1984).

Where a defendant's right to representation by the counsel of his choice is wrongly denied, "it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." United States v. Gonzalez-Lopez, 548 U.S. 140, 147-48 (2006). This is because the error is a structural one, not subject to harmlessness review. Id. at 148, 150.

A review of the record before us supports the district court's conclusion that Schneider's representation by attorneys Daniel Rashbaum and Allison Green would have created an insurmountable conflict of interest. Marcus Neiman & Rashbaum ("MNR") -- Rashbaum and Green's law firm -- also had represented Sheldon Rose, one of Schneider's coconspirators, in a related case and Rose was expected to testify against Schneider. This situation posed a serious potential for conflict, just as in

7

Ross, where we observed that a defendant's right to his counsel of choice could be overcome if the attorney "previously represented a person who will be called as a witness against a current client at a criminal trial." 33 F.3d at 1523. Further, as in Ross, where the disqualified attorney's partner had represented the government witness in a related matter, MNR had represented Rose when he pled guilty to charges arising out of the same criminal conduct as Schneider. See id. at 1522.

Indeed, the district court had wide discretion to disqualify Rashbaum and Green, especially since Rose was to testify as a government witness and MNR would have been required to cross-examine him. See Wheat, 486 U.S. at 163 (noting a district court's wide discretion to disqualify a defendant's counsel of choice, even in situations where "a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses"). While Schneider claims the district court based its decision to disqualify the attorneys on immaterial factors, the district court did not need to identify a specific conflict requiring their disqualification. See id. Regardless, as for Schneider's claim that it was immaterial that he had other counsel, we've considered the defendant's access to other counsel when reviewing a district court's decision to disqualify the defendant's counsel of choice. See Hobson, 672 F.2d at 829 n.*. As for Schneider's claim that it was immaterial that MNR had paid an independent attorney to represent Rose, Schneider does not identify any caselaw suggesting that a law firm or attorney's payment of a former client's legal fees does

8

not create a conflict of interest.[1]  Accordingly, on this record, the court did not abuse its considerable discretion in disqualifying the attorneys in this case.

We also find no merit to Schneider's claim that the district court plainly erred by permitting the government to argue in its closing argument that he lied on the stand.  To establish prosecutorial misconduct based on improper remarks in closing argument, the challenged remarks must (1) be improper and (2) prejudicially affect the defendant's substantial rights.  Sosa, 777 F.3d at 1294.  A prosecutor's remarks are improper if they express "personal views on a defendant's guilt," id. at 1297 (quotations omitted), or "exceed the evidence presented at trial," United States v. Reeves, 742 F.3d 487, 505 (11th Cir. 2014).  A prosecutor may argue during closing arguments that a witness is lying if the evidence supports his remarks.  United States v. Schmitz, 634 F.3d 1247, 1270 (11th Cir. 2011).  A prosecutor also may make closing remarks that draw conclusions from the evidence.  Reeves, 742 F.3d at 505.

In Sosa, we held that a prosecutor's closing remarks about a defendant's credibility were not improper because "the prosecutor made it sufficiently clear that he was urging the jury to conclude that [the defendant]'s testimony was not credible based on a consideration of the relevant evidence."  777 F.3d at 1298.  Nor were a prosecutor's remarks that the defendant had lied during his testimony improper in

---

[1] The out-of-Circuit decision he cites, Familia-Consoro v. United States, 160 F.3d 761 (1st Cir. 1998), is distinguishable.  There, a defendant's legal representation was paid for by a potential alternate defendant, not by a law firm now representing a party with materially adverse interests.

United States v. Rivera, where the comments had focused on the defendant's credibility and inconsistencies in his testimony, as contrasted with the consistency of a government witness's testimony.  780 F.3d 1084, 1100 (11th Cir. 2015).

Here, the district court did not err, plainly or otherwise, in finding that the government's four remarks during closing arguments -- arguing that Schneider was lying -- were not improper.  First, the government did not improperly express an opinion when it described Schneider's testimony that he had no reason to believe that a coconspirator, Steven Sanders, controlled the 20 shell companies as "one of the biggest lies in this case."  The government supported this argument by noting that the evidence in the record showed that 80% of the profits from the sales of these shell companies were sent to Sanders and his coconspirators, while only 2% went to the listed officers of the companies.  Second, the government was justified in arguing that Schneider was lying when he testified that coconspirator Jeffrey Lamson was not his client because it supported this argument by referencing a trial exhibit billing record to Lamson from Schneider's law firm.  Third, the government was justified in arguing that Schneider had lied when he told the SEC that the officers of the companies he represented would be lying if they said they had never heard of him because the government supported this argument by referencing the testimony of three straw officers who testified that they had never heard of Schneider.  And fourth, the government was justified in arguing that Schneider was lying in an opinion letter

10

when he asserted that he had relied on representations by the president of one of the shell companies because the government supported this argument by noting that the company president had testified that she had never heard of Schneider.

Accordingly, in all four instances Schneider cites, the record indicates that the government was not improperly expressing an opinion about Schneider's credibility, but rather was urging the jury to draw conclusions about his testimony based on evidence presented at trial. The district court did not err, plainly or otherwise, by finding that the prosecutor's remarks during closing arguments were not improper.

We also reject Schneider's claim that the district court erred by imposing a 20-level guideline enhancement after calculating a loss amount of $19.7 million, by ordering restitution based on this loss amount, and by imposing a 2-level enhancement because 10 or more victims were involved. For fraud offenses, the Guidelines provide an increase to a defendant's offense level depending on the amount of loss resulting from the fraud. U.S.S.G. § 2B1.1(b)(1). Section 2B1.1(b)(1)(K) provides for a 20-level enhancement where the loss from an offense was more than $9,500,000 but less than $25,000,000. Id. § 2B1.1(b)(1)(K), (L). Loss is considered either the actual loss or the intended loss, whichever is greater. Id. § 2B1.1, cmt. (n.3(A)). A defendant is accountable for all acts he committed, aided, abetted, or willfully caused, and, in a case involving joint criminal activity, for the activity of others if that conduct was (1) within the scope of the jointly

11

undertaken criminal activity, (2) in furtherance of that criminal activity, and (3) reasonably foreseeable in connection with that criminal activity. Id. § 1B1.3(a)(1). The court need only make a reasonable estimate of the loss, and the court's loss determination is entitled to appropriate deference. Id. § 2B1.1, cmt. (n.3(C)).

The Guidelines also provide for a two-level increase to a base offense level if the crime involved ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i). For purposes of § 2B1.1, "victim" means "any person who sustained any part of the actual loss" attributed to the crime. Id. § 2B1.1, cmt. (n.1).

In determining a defendant's relevant conduct in a conspiracy, the court must make particularized findings about the scope of the criminal activity the defendant agreed to jointly undertake. United States v. Hunter, 323 F.3d 1314, 1320 (11th Cir. 2003). That a defendant knew of the larger operation and agreed to perform a specific act does not demonstrate acquiescence in all acts of the criminal enterprise. Id. Notably, a court's failure to make individualized findings about the scope of the defendant's activity in a conspiracy is not grounds for vacating a sentence if the record supports the court's determination about the offense conduct, including the imputation of others' unlawful acts to the defendant. United States v. Petrie, 302 F.3d 1280, 1290 (11th Cir. 2002). Further, the court need only make a reasonable loss estimate, but must base its loss estimate on reliable and specific evidence and may not speculate about the existence of a fact. Barrington, 648 F.3d at 1197.

12

The Mandatory Victims Restitution Act ("MVRA") requires restitution orders for many offenses against property and full restitution to victims without consideration of the defendant's economic circumstances. 18 U.S.C. § 3663A(a)(1), (c)(1)(A); 18 U.S.C. § 3664(f)(1)(A). The district court may order restitution for losses arising out of the defendant's relevant conduct. Valladares, 544 F.3d at 1270.

Here, the district court did not clearly err when it used a $19,701,195 loss amount to enhance Schneider's sentence and to calculate the amount of restitution he owed. The court's estimate of the loss attributable to Schneider was supported by the evidence. That evidence included spreadsheets submitted by the government before sentencing that documented the losses suffered by investors who purchased stock in 4 of the 20 shell companies associated with Schneider's crimes of conviction, and calculated that loss as at least $19,701,195.

In fact, the testimony of coconspirator Michael Vax alone supported a loss amount of up to $40 million. According to Vax, Schneider and Vax discussed an illegal pump-and-dump scheme, Vax used the shares he acquired with Schneider's assistance to carry out the scheme, in which he and his coconspirators sold 50 million shares worth around $40 million, and Schneider created and reviewed false press releases used in the scheme. This testimony supported the findings that Schneider reasonably could have foreseen a $40 million loss amount and that the scheme was within the scope of Schneider's jointly undertaken criminal activity and in

13

furtherance of that activity.   Also, the revised presentence investigation report ("PSI") noted that one purpose of the shell companies' sales was to facilitate pump-and-dump schemes.  Thus, the district court did not err when it calculated the loss amount as $19,701,195 or when it ordered restitution based on this loss amount.

Nor did the district court clearly err in calculating ten or more victims.  The evidence presented supported a finding that the pump-and-dump schemes fell within the scope of Schneider's relevant conduct and caused losses to thousands of investors.  If anything, a finding of ten victims or more downplayed the actual number of investors harmed by the conspiracy's relevant conduct; the government submitted evidence documenting only the losses suffered by investors who bought stock in 4 of the 20 shell companies involved in Schneider's crimes of conviction.

Next, we are unconvinced by Schneider's argument that the district court abused its discretion by rejecting his vindictive prosecution claim.  The government violates a defendant's due process rights when it vindictively seeks to retaliate against him for exercising his legal rights.  Bordenkircher v. Hayes, 434 U.S. 357, 362-63 (1978); see also Fed. R. Crim. P. 32(f)(1) (providing that defendants may object to material information appearing in the PSI).  A defendant can establish actual prosecutorial vindictiveness if he can show that the government's justification for a retaliatory action is pretextual.  Jones, 601 F.3d at 1261.  In the plea-bargaining context, the Supreme Court has said that vindictiveness does not arise when the

14

defendant is free to accept or reject the prosecution's offer.  Bordenkircher, 434 U.S. at 363.  However, the Supreme Court has recognized that vindictive sentencing can occur when a court imposes an increased sentence after a defendant successfully attacks a prior conviction.  Texas v. McCullough, 475 U.S. 134, 137-38 (1986).

Here, the government's advocacy for a higher loss finding at sentencing did not amount to vindictive prosecution.  Importantly, Schneider offers no evidence of actual vindictiveness to show that the government's justification for seeking an increased loss amount based on recently available data was pretextual.  See Jones, 601 F.3d at 1261.  And just as in the plea-bargaining context in Bordenkircher, Schneider was free to maintain his objection to loss amount in the initial PSI. Further, Schneider does not cite any caselaw discussing prosecutorial vindictiveness in the context of sentencing.  While a court may violate a defendant's due process rights by imposing a higher sentence after a defendant successfully attacks a prior conviction, see McCullough, 475 U.S. at 134, 137-38, it is difficult to envision how the government could do so by merely asking the sentencing court to make a factual finding supported by the evidence.  Thus, we affirm as to this issue too.

Nor do we agree with Schneider's claim that the district court plainly erred by failing to consider certain factors at sentencing.  The district court must impose a sentence "sufficient, but not greater than necessary" to comply with these purposes: the need to reflect the seriousness of the offense, promote respect for the law, provide

15

just punishment for the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct. 18 U.S.C. § 3553(a)(2). In imposing a sentence, it should also consider, inter alia, the nature and circumstances of the offense and the defendant's history and characteristics. Id. § 3553(a)(1). The court need not use specific language or articulate its consideration of each individual § 3553(a) factor, so long as the whole record reflects its consideration of those factors. United States v. Ghertler, 605 F.3d 1256, 1262 (11th Cir. 2010).

Here, Schneider's procedural reasonableness claim is subject to plain error review because he did not object to his sentence on procedural reasonableness grounds in district court. Regardless, the district court did not err, plainly or otherwise, by imposing an 84-month below-guideline sentence. The court noted that it was considering all the sentencing factors in imposing Schneider's sentence, specifically referenced his age and lack of prior criminal history throughout the sentencing hearing, and mentioned his age in explaining its decision to vary 50% below the bottom of the guideline range. Accordingly, the record reflects the district court's consideration of the § 3553(a) factors, and we affirm Schneider's sentence.

Finally, we are unpersuaded by Schneider's claim the district court plainly erred by ordering forfeiture as to each count of the indictment or for property that Schneider did not obtain as the result of his money laundering offenses. In Honeycutt v. United States, 137 S. Ct. 1626 (2017), the Supreme Court considered

16

whether, under 21 U.S.C. § 853, a defendant could be held jointly and severally liable for property his coconspirator derived from the crime but the defendant himself did not acquire.  The Court concluded that imposing this liability would be inconsistent with the statute's text and structure, because forfeiture under § 853(a)(1) was limited to tainted property the defendant himself acquired as a result of the crime.  Id. at 1630, 1635.  Notably, the statute at issue in Honeycutt, § 853(a)(1), requires forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of [a drug] violation."

By contrast, 18 U.S.C. § 982(a)(1), the statute mandating forfeiture for money laundering offenses, requires forfeiture of "any property, real or personal, involved in such offense, or any property traceable to such property."  In Waked Hatum, we reasoned that Honeycutt's "tainted property" requirement did not apply to § 982(a)(1) because this statute "contain[ed] neither a 'proceeds' nor an 'obtained' limitation."  969 F.3d at 1165.  Similarly, § 981(a)(1)(C), the statute governing forfeiture for securities and wire fraud offenses, provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" any securities or wire fraud offense is subject to forfeiture to the government.  See 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(A), 1961(1).

Because Schneider did not raise his arguments about the district court's forfeiture order in district court, we review only for plain error, and can find none.

17

For starters, imposing the forfeiture order on a count-by-count basis was permitted under 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), the statutes that governed forfeiture in this case. Moreover, as we've noted, the statutes involved in the wire and securities fraud offenses found in Counts 1 through 12 (§ 981(a)(1)(C)) and in the money laundering offenses found in Counts 13 through 33 (§ 982(a)(1)) contain broad forfeiture provisions that do not limit forfeiture on a count-by-count basis. Further, the government already has acknowledged that it would not seek to "double count" in its collection of the forfeiture money judgments.

Nor did the district court plainly err by imposing forfeiture on money obtained by Schneider's coconspirators as proceeds of their criminal conduct after it passed through a trust account maintained by his law firm. Schneider's reliance on Honeycutt is misplaced because we've already recognized that Honeycutt's "tainted property requirement" does not apply to § 982(a)(1), the statute mandating forfeiture for Schneider's money laundering offenses. Waked Hatum, 969 F.3d at 1165. Thus, Schneider has not shown that it was plainly erroneous for him to be held liable for property he did not personally obtain as proceeds of the conspiracy, and we affirm as to this issue as well.[2]

**AFFIRMED**.

---

[2] Schneider waived his argument about the district court's order granting forfeiture of substitute assets by raising it for the first time in his reply brief. See United States v. Magluta, 418 F.3d 1166, 1185-86 (11th Cir. 2005).